UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

**FILED**

SEP 1 8 2014

U. S. DISTRICT COURT
EASTERN DISTRICT OF MO
CAPE GIRARDEAU

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) No. | |
| | ) | |
| SONJAY JOSEPH FONN, D.O., | ) | |
| DEBORAH SEEGER, | ) | **1:14CR00089JAR/ACL** |
| DS MEDICAL, L.L.C., | ) | |
| AND | ) | |
| MIDWEST NEUROSURGEONS, L.L.C., | ) | |
| | ) | |
| Defendants. | ) | |

## INDICTMENT

The Grand Jury charges that:

## INTRODUCTION

### Defendants

1.     At all times relevant to this indictment, defendant Sonjay J. Fonn, D.O., was

licensed by the State of Missouri as an osteopathic physician. His specialty is neurosurgery.

2.     Defendant Midwest Neurosurgeons, L.L.C. ("MWN") is a Missouri limited

liability company formed by Dr. Fonn on or about December 4, 2008.

3.     At all times relevant to this indictment, Deborah Seeger was licensed by the State

of Missouri as an advanced practice nurse. At times relevant to this indictment, Seeger practiced

at Midwest Family Care, a nurse practitioner group located in Cape Girardeau, Missouri.

4.     Defendant DS Medical, L.L.C. is a Missouri limited liability company formed by

Seeger on or about November 12, 2008. DS Medical is located in Cape Girardeau, Missouri and

distributes medical devices and supplies used in lumbar and cervical fusion of the spine.
Defendant Seeger is the president and chief executive officer of DS Medical.

5.     Co-conspirator T.S. started working in the medical device industry in or about
1996. In or about 2005, he created his own Texas-based company, referred to hereafter as
Manufacturer A, which sold spinal implants and other products directly to medical providers or
through distributors, such as DS Medical.

## Dr. Fonn And Seeger's Relationship

6.     At all times relevant to this indictment, Dr. Fonn and Seeger had a personal
relationship and lived together in the same residence. Since at least June 2008, Fonn and Seeger
have been engaged to be married, but have never actually married.

7.     At times relevant to this indictment, Dr. Fonn's and Seeger's business activities
were also closely intertwined. For example, DS Medical rented space from MWN, and MWN
and DS Medical had "shared" employees and contractors. Dr. Fonn was frequently present at
DS Medical business meetings.

## Relevant Medicare Provisions

8.     The Medicare Program is a federal health benefits program for the elderly,
disabled, and ESRD (end stage renal disease) patients. Part A of the Medicare Program
authorizes payment of federal funds for inpatient care, including but not limited to inpatient
surgical procedures, while Part B of the Medicare Program authorizes payment for outpatient
health services, including but not limited to physician services.

9.     The United States Department of Health and Human Services (HHS), through the
Centers for Medicare and Medicaid Services (CMS), administers the Medicare Program. CMS .

2

acts through fiscal agents, which are private companies that review claims and make payments to providers for services rendered to Medicare beneficiaries.

10. To receive Medicare reimbursement, providers must submit a written application and execute a written provider agreement. The provider agreement obligates the provider to know, understand, and follow all Medicare regulations and rules.

11. In 2009, Dr. Fonn submitted an application and later became a Medicare provider. The Medicare provider application, specifically Section 14, entitled "Penalties for Falsifying Information," informed Dr. Fonn that federal criminal law prohibits (a) the making or use of false or fraudulent statements, representations, or documents, (b) the concealment or cover up by trick, device, or deceit of a material fact, and (c) the execution or attempted execution of a fraud scheme, if these actions are related to the delivery or payment for health care benefits, items, or services.

12. On or about February 13, 2009, Dr. Fonn signed Section 15, entitled "Certification Statement" of the Medicare provider application, which provides:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me . . . The Medicare laws, regulations, and program instructions are available through the fee-for-service contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

## Relevant Medicaid Provisions

13. The Missouri Department of Social Services, Division of Medical Services (DMS), administers the Missouri Medicaid Program (now known as MO HealthNet), which is jointly funded by the State of Missouri and the federal government. Missouri Medicaid reimburses health care providers for covered services rendered to eligible low-income Medicaid

recipients. The Medicaid Program is a federal health benefits program, as defined in Title18,

United States Code, Section 24.

14. A Medicaid provider must enter into a written agreement with DMS to receive

reimbursement for medical services to Medicaid recipients and must agree to abide by DMS's

regulations in rendering and billing for those services. A Medicaid provider must submit claims

by completing a CMS-1500 form, which contains the following certification:

> the services listed above were medically indicated and necessary to the health of
> this patient and were personally furnished by me or my employee under my
> personal direction . . . and . . . the foregoing information is true, accurate and
> complete. I understand that payment and satisfaction of this claim will be from
> Federal and State funds, and that any false claims, statements, or documents, or
> concealment of a material fact, may be prosecuted under applicable Federal or
> State laws.

## Anti-Kickback Act

15. Compliance with the Anti-Kickback Act (42 U.S.C. § 1320a-7b(b)) is a condition

of payment for both Medicare and Medicaid. As stated above, this condition is set out in the

Medicare provider application, which Dr. Fonn signed on or about January 13, 2009; February

13, 2009; and June 15, 2009.

16. The Anti-Kickback Act prohibits any person or entity from soliciting, making, or

accepting remuneration to induce or reward any person for referring, recommending or arranging

for federally funded medical services provided under the Medicare and Medicaid programs.

Remuneration is defined broadly as anything of value, including money, goods, services, or the

release or forgiveness of a financial obligation the other party would normally have to pay. By

this Act, Congress intended to prohibit financial incentives to doctors which could affect their

medical judgment and lead to the provision of medically unnecessary goods and services.

4

## Defendants' Knowledge Of The Anti-Kickback Law

17. As professionals in the health care industry, Dr. Fonn, Seeger, and co-conspirator T.S. received training and guidance on the Anti-Kickback statute from various sources and understood the Anti-Kickback statute's prohibitions and requirements as it related to their businesses. Both Seeger and Dr. Fonn recognized their legal liability if Dr. Fonn received anything of value from DS Medical. Similarly, co-conspirator T.S. understood that he could not give illegal remuneration to his customers to induce them to purchase his company's products for Medicare and Medicaid patients.

18. Dr. Fonn's understanding of the Anti-Kickback statute is reflected in an e-mail he sent on or about September 28, 2008. Dr. Fonn informed a spinal implant manufacturer salesperson that he could not accept free tickets to a sports event "due to the new rules regarding physician inducement, it WOULD be considered an inducement or kickback for [the company] to buy [me] tickets."

19. Similarly, e-mails between Seeger and co-conspirator T.S. reflect their knowledge of the Anti-Kickback Act and Stark Act limitations. In a February 10, 2009 e-mail, Seeger asked co-conspirator T.S. about a trip to India, noting "Dr. Fonn requests that we travel first class accommodations since it is such a long flight, it makes a big difference in comfort." Co-conspirator T.S. responded that "we can only pay for coach class tickets for the surgeon [due] to laws set forth in Stark and enforced by OIG and the US Justice Dept . . ." Later, Seeger stated in an e-mail to Dr. Fonn: "obviously they should not take the difference [between the cost of coach and first class tickets] for your flight out of my commissions."

20. Additionally, on or about February 20, 2009, Dr. Fonn was told by the hospital where he performed surgeries: "what our legal department will need from you is a detailed

5

description of DS Medical and any relationship you have with that company. We will send that to our legal department and they will more than likely have you sign a prepared statement to ensure that you are not to be compensated in any way from DS Medical and any relationship you have with that company."

21.     On or about June 10, 2009, Seeger asked Manufacturer A to pay for air fare for Dr. Fonn to travel to a medical training course, noting "I can't pay for him from DS Medical."

22.     On or about October 27, 2011, Seeger received an e-mail from another spinal implant manufacturer (Manufacturer B), specifically discussing her responsibilities as a distributor under the Anti-Kickback statute. The e-mail noted that the "general rule" for health care providers was "no gifts," although occasional modest gifts valued under $100 may be provided if the gifts benefitted patients or served an educational function.

23.     Despite this knowledge, Dr. Fonn, Seeger, co-conspirator T.S., and others conspired to illegally circumvent the Anti-Kickback law (a) by soliciting, receiving, or providing illegal remuneration and (b) by concealing Dr. Fonn's role and active involvement in DS Medical and the financial benefits he received from DS Medical.

## Dr. Fonn and Seeger's Relationship to the Hospital

24.     Beginning in or about November 2008 and continuing to in or about the spring of 2014, Dr. Fonn had privileges at a hospital located in Cape Girardeau, Missouri ("Hospital") and performed spinal implant surgeries at the Hospital. The Hospital considered spinal implants as a "physician preference" item, which meant physicians performing surgeries at the Hospital could pick and choose, for each of their surgeries, spinal implants from one of many spinal implant manufacturers. Physicians were expected to use their expertise and knowledge to pick spinal

6

implants that best suited each patient's medical needs and that gave each patient the best chance of having a favorable surgical outcome.

25.     Physicians could deal directly with the spinal implant manufacturers or obtain the implants through a distributor. After physicians chose the spinal implants and used them in the patients' spinal surgeries, the spinal implant manufacturers would send the Hospital an invoice which the Hospital paid.

26.     In many instances, the spinal implant manufacturers utilized distributors, such as DS Medical, to sell their products and would pay the distributor a commission for each sale. Generally, the manufacturer and the distributor entered into written contracts defining the amount of the commission, which was a set percentage of the amount the Hospital paid for the surgical devices.

27.     After the surgery, the Hospital would submit reimbursement claims to Medicare and Medicaid and other health insurance companies for the Hospital's cost of acquiring the spinal implant devices and other costs and services associated with the surgeries. Medicare Part A and Medicaid paid the Hospital for these costs.

28.     Additionally, Dr. Fonn and MWN submitted, or caused to be submitted, separate reimbursement claims to the Medicare Part B and Medicaid programs for physician services associated with each surgery. Medicare Part B and Medicaid paid Dr. Fonn and MWN for these costs. Dr. Fonn knew that some of his spinal implant patients were beneficiaries of the Medicare and Medicaid programs. Thus, he knew the Anti-Kickback Act applied to the services he provided to these beneficiaries.

7

## Seeger and Dr. Fonn Jointly Operated DS Medical

29. From the beginning of DS Medical's operation in 2008 until it ceased operating in or about March 2012, Dr. Fonn and Seeger operated DS Medical together as a joint venture, using it as a common enterprise for their mutual economic benefit. DS Medical's extraordinary financial success was based on Dr. Fonn's decision to use DS Medical as his primary source of spinal implants and related products for all of his patients. Over 90% of DS Medical's revenues were derived from commissions for products ordered by Dr. Fonn. As such, DS Medical relied almost exclusively on Dr. Fonn's patient population and referrals for its revenues.

30. DS Medical had little real financial risk or marketing expenses upon opening or while operating. In December 2008, the first full month of operation for DS Medical, Dr. Fonn ordered approximately $1,330,090 worth of spinal implants through DS Medical for his surgeries, more than twice as much as his nearest medical peer in the local health care market. At the same time, DS Medical incurred almost no "start up" costs in 2008 or 2009, beyond buying a printer, a computer, and some office supplies.

31. In addition to being DS Medical's only significant physician customer, Dr. Fonn played an important management role at DS Medical. He assumed this role because he directly and indirectly benefitted financially from DS Medical's success.

32. Determining the price of goods offered for sale is one of the most important functions of a distributorship. Dr. Fonn was actively involved in making these decisions. As an example, during February and March 2009, a Hospital employee noted how high Dr. Fonn's implant costs were compared to his peers, and decided it was "now urgent" to communicate directly with Dr. Fonn. The Hospital employee had already "communicated the issue with his sales rep but it appears they keep putting us off." Dr. Fonn met with the Hospital employee

8

twice. After the second meeting, the Hospital employee informed other Hospital employees on February 23, 2009 that "after meeting with Dr. Fonn this afternoon, he informed me that his vendor of choice for instrumentation will be lowering their prices."

33. During February 2009, the Hospital also told Dr. Fonn that DS Medical's pricing for a cervical fusion product was too high, and the Hospital could obtain the exact same product from another vendor for a substantially lower price. On February 23, 2009, Dr. Fonn forwarded the Hospital employee's pricing e-mail to Seeger, adding "Get the [cervical fusion product] pricing squared away with [spinal product salesperson A and B] FIRST before you call [the hospital employee.] [The hospital] is willing to accept the lower price – my advice is to take it rather than a higher percentage of ZERO!"

34. Dr. Fonn's involvement in DS Medical was further illustrated when DS Medical had a dispute with Manufacturer A during the summer of 2009. The manufacturer claimed that DS Medical lost a substantial amount of inventory, namely spinal implant hardware.

35. On or about August 18, 2009, Seeger informed a representative of Manufacturer A that "Dr. Fonn wanted to make sure that everything was solid for me" and further that Dr. Fonn had instructed Seeger to "see what else is out there in case there was a problem" and to "get ready" if there was no new contract resolving the commission/inventory dispute with Manufacturer A. Negotiations to resolve the dispute between DS Medical and Manufacturer A ultimately failed during the fall of 2009.

36. Subsequently, Dr. Fonn ceased ordering spinal implants from Manufacturer A, although he had been using them for months and could have ordered Manufacturer A's spinal implants from distributors, other than DS Medical. Instead, Dr. Fonn made the decision to

9

continue to use DS Medical as his sole distributor because he wanted to receive the financial benefits flowing from his use of DS Medical.

37.     On or about October 31, 2009, Dr. Fonn personally approached spinal implant Manufacturer B and asked for a meeting with the executives of Manufacturer B. An executive of Manufacturer B recognized the value of Dr. Fonn's business to his company: the executive listed as a "pro" that Fonn "could bring in between $200 – 400k a month in business" and a "con" that Fonn was "idiosyncratic." After a November 3, 2009 meeting attended by both Dr. Fonn and Seeger, on or about November 17, 2009, Manufacturer B raised DS Medical's commission rate to 50% and began paying a monthly "commission enhancement" of $1700 a month to DS Medical.

38.     Having worked out a lucrative contract for DS Medical, Dr. Fonn began purchasing large amounts of spinal implants from Manufacturer B. In essence, Dr. Fonn decided what spinal implant to use, based on what was best financially for DS Medical, Seeger, and himself.

## Dr. Fonn and Seeger Solicited Illegal Payments for Orders

### $10,000 Advance to DS Medical

39.     As previously stated, Manufacturer A was owned and operated by co-conspirator T.S. In or about December 2008, co-conspirator T.S. met with Dr. Fonn and Seeger in Cape Girardeau, Missouri. Dr. Fonn introduced Seeger as his sales representative. Dr. Fonn further stated that he was a very busy surgeon, would need three sets of tools on hand, and would need to be "re-stocked" the day after his surgeries.

40.     Seeger solicited and received a $10,000 advance or sign-on bonus from

10

co-conspirator T.S., who had never given an advance to any other distributor. Co-conspirator T.S. was willing to give DS Medical an advance because he believed that Dr. Fonn would only use DS Medical for spinal implant products. At the time of the advance, Seeger had nothing else to offer, other than Dr. Fonn's orders for spinal implants. Seeger had never operated or been employed by a spinal implant distributorship or any other medical device distributorship and had no clients, other than Dr. Fonn. Seeger could not personally conduct appropriate product evaluations or evaluate competing spinal implant products.

High Commission Payments to DS Medical

41.     Seeger also requested a 40-50 % commission from Manufacturer A. To secure Dr. Fonn's orders, co-conspirator T.S agreed to a 50% commission. Co-conspirator T.S believed that Dr. Fonn was a high volume surgeon and DS Medical and Seeger had Dr. Fonn's business locked up and would direct Dr. Fonn's orders to Manufacturer A. In exchange for the advance and a 50% commission, Dr. Fonn ordered, and the Hospital paid Manufacturer A, approximately \$3,690,538 for spinal implants from January through August 2009. DS Medical was paid approximately \$1,259,000 in commissions for spinal implants purchased during this same period.

42.     As a result of the 50% commission for specified products, DS Medical arranged for the purchase of a large number of products from Manufacturer A. For some months (March and April 2009), Dr. Fonn's surgeries represented 25-33% of the sales revenues of Manufacturer A. Thus, co-conspirator T.S, as the owner of Manufacturer A, benefited financially from the excessive commissions that he paid to DS Medical.

**Co-conspirator T.S. Offered Other Illegal Remuneration for Dr. Fonn's Orders**

43.     DS Medical failed to manage the spinal implant inventory, and several spinal implant manufacturers raised significant inventory discrepancies with DS Medical after audits.

11

For example, co-conspirator T.S claimed that DS Medical lost $431,834 worth of screws, cages, rods, spacers, and other spinal implants. In June 2009, co-conspirator T.S started holding DS Medical's commission checks because Seeger and DS Medical had not returned or accounted for the missing inventory.

44.    In an e-mail dated August 10, 2009 to co-conspirator T.S, Seeger stated: "I also wanted to check with you regarding our discussion about the resolution to the inventory. When we spoke recently my understanding was that the inventory would be zeroed out and we would start fresh and that Thomas was sending me a contract or some papers about it."

45.    In an e-mail dated August 12, 2009, an employee of co-conspirator T.S. informed Seeger: "We are prepared to absorb the financial impact of the missing inventory in its entirety. Before doing this, however, we would like for you to commit to using our PEEK and metal implants for a period of at least three years." Co-conspirator T.S. was copied on the e-mail. Co-conspirator T.S. believed an exclusive contract was needed to absorb the loss.

46.    Seeger responded in part: "You have asked me to verify my intention to continue to use [your] products in the future. I am happy to do so, subject to the fact that it will be the physicians with whom DS Medical works who will ultimately make those decisions." At the time, DS Medical had only one physician, Dr. Fonn.

47.    In an e-mail dated August 25, 2009 to co-conspirator T.S., Seeger stated: "I am still waiting for you to provide the document we discussed, and my July commission check." Co-conspirator T.S. subsequently sent a forbearance agreement, which was the document Seeger had referred to in her earlier e-mail. The proposed forbearance agreement dated September 1, 2009 stated that spinal implant Manufacturer A

is willing to absorb the financial loss [$431,834] of the missing medical equipment inventory and is also willing to forgo pursuing reimbursement and

12

seeking damages from DS Medical with respect to the missing medical equipment
. . . so long as DS Medical continues to sell [spinal implant manufacturer's]
medical equipment . . . for a period of two calendar years . . . from the date of this
Agreement, and DS Medical's monthly sales volume . . . of medical equipment
shall not be less than . . . $200,000 for any one calendar month during the term of
this Agreement.

48.     In text message dated September 10, 2009, T.S. stated in part: "I know you

gave/received the contract. Let me know by close of business tomorrow what you want to do. If

I haven't heard from you by then we will take full action and notify all hospitals what's going

on." The proposed forbearance agreement was ultimately rejected by Seeger and DS Medical.

## Dr. Fonn Altered His Medical Practice After DS Medical Opened

49.     Once DS Medical started operating, Dr. Fonn altered the way he practiced

medicine, generally using more spinal implants in each of his surgeries while performing more

surgeries than he typically performed before DS Medical began operating. Multiple persons

within the health care industry noted Dr. Fonn's unusual spinal implant utilization patterns.

50.     For example, on or about December 16, 2008, one employee of a spinal implant

manufacturer sent an e-mail explaining "why I love Dr. Fonn," disclosing that Fonn's surgeries

involved "40k [a] day" and "likely 150k [a] week" worth of spinal implant purchases. "Gotta

love it" was the spinal implant manufacturer employee's conclusion.

51.     Similarly, on or about February 6, 2009, a Hospital employee told other Hospital

employees that "it is now urgent that we communicate with Dr. Fonn" as "this appears to be

getting out of hand." The Hospital employee noted that Dr. Fonn's vendor (through DS

Medical) charged $3150 for connectors while another Hospital vendor only charged $1341.

52.     Seeger herself reached similar conclusions. In text messages dated on or about

December 14, 2009, March 26, 2010, and March 29, 2010, Seeger noted with excitement that Dr.

Fonn used nine spacers in one patient's surgery, nine spacers in another patient's surgery, and

13

twelve spacers in another patient's surgery, concluding "more is better" and wondering if an employee of the spinal implant company was going to "have a stroke" over the amount of spacers used (and sold to the Hospital) during the surgeries.

53.    Similarly, a private health care benefit program conducted a review of Dr. Fonn's surgical charges, and determined that his billed amounts were significantly higher than other local neurosurgeons. In July 2010, the health care benefit program considered a number of "strategic options," including "terminate Dr. Fonn" and "investigate allegations of possibility of conflict of interest," after discovering that Seeger, Fonn's fiancé, was his sole source spinal implant distributor.

## DS Medical Provided Remuneration to Dr. Fonn

54.    A key purpose for creating and operating DS Medical was to enable Dr. Fonn to profit from his decisions to purchase spinal implants from DS Medical, while at the same time creating the illusion that he had no ownership, operational control, or financial interest in DS Medical. In reality, Dr. Fonn actively participated in matters related to DS Medical and benefited greatly in return for his orders to DS Medical.

55.    DS Medical had extraordinary financial returns. DS Medical's federal tax returns indicate that DS Medical had an approximate net profit margin of 95% in 2009, using the company's reported gross income versus the adjusted gross income after deductions. DS Medical's approximate profit margin was 94% in 2010, and 86% in 2011. Seeger's gross income with DS Medical in 2009, the company's first full year in operation, was approximately 31 times what she reported as wage income for 2008.

56.    Every time Dr. Fonn ordered a spinal implant or other items through DS Medical, Seeger received a commission from the spinal implant manufacturer. Dr. Fonn and Seeger

14

together spent spinal implant commission revenue from DS Medical. Several examples are listed below.

57.     Seeger purchased a residence in April 2009, using the commission revenue from DS Medical. Although the residence was titled in Seeger's name, both Seeger and Dr. Fonn resided in the residence. The purchase price of the residence was approximately 99% of the April deposits into DS Medical's bank account. In other words, DS Medical's primary expense for April 2009 was the purchase of a house used by its biggest and only physician/customer.

58.     Dr. Fonn and Seeger made additional purchases, including but not limited to the ones listed below. Dr. Fonn is listed as the customer on the invoices for these purchases and Seeger used DS Medical commission revenue to pay for the items purchased:

| Dates | Items Purchased | Approximate Cost |
|---|---|---|
| 2009-2010 | Media room/ equipment | $231,000 |
| December 2009 | Pool and spa | $50,000 |
| November 2010 | Landscaping/patio | $49,000 |

59.     In or about February 2012, Dr. Fonn and Seeger purchased a yacht. Dr. Fonn is listed as the customer on a number of documents related to the purchase. Seeger used DS Medical commission revenue in the amount of approximately $245,000 to pay for the yacht.

## COUNT 1
## THE CONSPIRACY AND ITS OBJECTS
## 18 U.S.C. § 371

60.     Paragraphs 1-59 are incorporated by reference as if fully set out herein.

61.     From in or about 2008 and continuing to in or about March 2012, with the exact dates unknown, in the Eastern District of Missouri and elsewhere,

15

## DR. SONJAY J. FONN,
## DEBORAH SEEGER,
## DS MEDICAL, L.L.C., and
## MIDWEST NEUROSURGEONS, L.L.C.,

the defendants herein, and others known and unknown, willfully and knowingly did combine,

conspire, confederate, and agree together, and with each other, to commit offenses against the

United States, that is,

a. to knowingly and willfully solicit and receive illegal remuneration (including any

kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind

in return for purchasing, leasing, ordering and arranging for and recommending the

purchasing, leasing and ordering any good, facility, service, and item for which

payment may be made in whole or in part under a Federal health care program, in

violation of 42 U.S.C. § 1320a-7b(b) and

b. to knowingly and willfully execute or attempt to execute a scheme and artifice to

defraud a health care benefit program, in connection with the delivery or payment for

health care benefits, items, or services, in violation of 18 U.S.C.§ 1347.

## PURPOSE OF THE CONSPIRACY

The purpose of the conspiracy was for:

a. Dr. Fonn and Seeger, through DS Medical, to solicit and receive illegal remuneration,

in the form of sales commissions and other things of value, from the manufacturers of

medical devices in exchange for Dr. Fonn's orders of the manufacturers' medical

devices;

b. the medical device manufacturers to provide illegal remuneration to DS Medical and

Seeger to obtain orders from Dr. Fonn for spinal implants used in his surgeries; and

16

c. Dr. Fonn and Seeger to use DS Medical commissions to acquire real estate, vehicles, planes, and other things of value for the benefit of Dr. Fonn in exchange for Dr. Fonn's orders for medical devices.

## MANNER AND MEANS OF THE CONSPIRACY

62. It was part of the conspiracy that Seeger was listed as the owner of DS Medical, but from its inception Dr. Fonn and Seeger intended to and did operate DS Medical together as a joint venture for their mutual economic benefit.

63. It was part of the conspiracy that Dr. Fonn and Seeger attempted to conceal his significant involvement in the management of DS Medical.

64. It was part of the conspiracy that Dr. Fonn caused the Hospital to purchase medical devices from manufacturers, which paid DS Medical high commissions and caused the Hospital to submit reimbursement claims to Medicare and Medicaid for the medical devices.

65. It was part of the conspiracy that Dr. Fonn, Seeger, and DS Medical solicited and received kickbacks, in the form of advances, high commissions, and other things of value, from co-conspirator T.S., Manufacturer A, and other manufacturers of medical devices.

66. It was part of the conspiracy that Dr. Fonn altered his practice and used more spinal implants and related items in his surgeries while DS Medical was obtaining medical devices for his surgeries.

67. It was part of the conspiracy that Dr. Fonn received a financial benefit from DS Medical and Seeger in exchange for his orders for spinal implants and related items through DS Medical and Seeger.

17

## OVERT ACTS

68.　In furtherance of the conspiracy, and to effect the objects of the conspiracy, the following overt acts, among others, were committed in the Eastern District of Missouri:

69.　In or about December 2008, Seeger asked co-conspirator T.S. for a $10,000 advance.

70.　On or about January 13, 2009, co-conspirator T.S. signed a contract with DS Medical, which included a $10,000 advance and a 50% commission for DS Medical.

71.　On or about February 10, 2009, Seeger sent an e-mail to co-conspirator T.S, entitled "Trip to India," which states in part: "Dr. Fonn requests that we travel first class accommodations since it is such a long flight, it makes a big difference in comfort."

72.　On or about September 1, 2009, co-conspirator T.S. offered to forgive and waive payment for missing spinal implants and related items, worth $431,834, in exchange for Dr. Fonn, Seeger, and DS Medical's orders of spinal implants and related items from Manufacturer A for two years.

73.　On or about the dates listed below, Manufacturer A made the following commission payments to DS Medical:

| Dates | Commissions Paid To DS Medical |
|---|---|
| March 30, 2009 | $128,070.00 |
| April 24, 2009 | $ 275,836.30 |
| June 3, 2009 | $185,812.55 |
| June 26, 2009 | $159,514.25 |
| February 25, 2011 | $133,333.33 |

18

74.     On or about August 17, 2009, Seeger made a DS Medical check in the amount of
$58,296.91, payable to Stereo One, to make a partial payment on a media room, stereo
equipment, and other items.

75.     On or about December 29, 2009, Seeger made a DS Medical check in the amount
of $50,000, payable to Farmer's Pool and Spa, to make a partial payment on a pool.

76.     On or about March 8, 2012, Seeger wired $226,364.50 from a DS Enterprises
account to United Yacht Sales, to make a partial payment on a yacht. Seeger had earlier
transferred commission payments into the account of DS Enterprises, a company that she owned
and controlled.

All in violation of Title 18, United States Code, Section 371.

## COUNTS 2-3
## ANTI-KICKBACK VIOLATION
## 42 U.S.C. § 1320a-7b(b)

77.     Paragraphs 1- 59 are incorporated by reference as if fully set out herein.

78.     From in or about January 2009, and continuing until to in or about April 2011,

with the exact dates unknown, within the Eastern District of Missouri, and elsewhere,

## DR. SONJAY J. FONN,
## DEBORAH SEEGER,
## DS MEDICAL, L.L.C., and
## MIDWEST NEUROSURGEONS, L.L.C.,

the defendants herein, did knowingly and willfully solicit and receive remuneration, directly and
indirectly, overtly and covertly, in cash and in kind, in return for ordering, purchasing, and
arranging for the ordering and purchasing of spinal implants and related items for Dr. Fonn's
patients, including Medicare and Medicaid patients, for which payments would be made in
whole or part by the Medicare or Medicaid Programs.

19

| Count | Date of Payment | Amount of Payment |
|-------|-----------------|-------------------|
| 2 | March 28, 2011 | $133,333.33 |
| 3 | April   29, 2011 | $133,333.33 |

All in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(B), and Title 18,

United States Code, Section 2.

## COUNT 4
## ANTI-KICKBACK VIOLATION
## 42 U.S.C. § 1320a-7b(b)

79. Paragraphs 1-38 and 49-59 are incorporated by reference as if fully set out herein.

80. On or about October 31, 2009, within the Eastern District of Missouri, and

elsewhere,

### DR. SONJAY J. FONN,
### DEBORAH SEEGER,
### DS MEDICAL, L.L.C., and
### MIDWEST NEUROSURGEONS, L.L.C.,

the defendants herein, did knowingly and willfully solicit remuneration, directly and indirectly,

overtly and covertly, in cash and in kind, from Manufacturer B to induce and reward them for the

purchase and ordering of spinal implants and related items for Dr. Fonn's patients, including

Medicare and Medicaid patients, for which payments would be made in whole or part by the

Medicare or Medicaid Programs.

All in violation of Title 42, United States Code, Section 1320a-7b(b)(1)(B), and Title 18,

United States Code, Section 2.

## FORFEITURE ALLEGATION

The Grand Jury further finds by probable cause that:

1. Pursuant to Title 18, United States Code, Section 982(a)(7), upon conviction of an

offense in violation of Title 18, United States Code, Section 371 conspiracy to violate Title 18,

20

United States Code, Section 1347 as set forth in Count 1, or a violation of Title 42, United States Code, Section 1320a-7b(b), as set forth in Counts 2-4, the defendants shall forfeit to the United States of America any property, real or personal, constituting or derived, directly or indirectly, from gross proceeds traceable to said offense.

2.     Subject to forfeiture is a sum of money equal to the total value of any property, real or personal, constituting or derived from any proceeds traceable to said offense.

3.     If any of the property described above, as a result of any act or omission of the defendants:

    a.     cannot be located upon the exercise of due diligence;

    b.     has been transferred or sold to, or deposited with, a third party;

    c.     has been placed beyond the jurisdiction of the court;

    d.     has been substantially diminished in value; or

    e.     has been commingled with other property which cannot be divided without difficulty,

the United States of America will be entitled to the forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

A TRUE BILL.

_____  _____
FOREPERSON

RICHARD G. CALLAHAN
United States Attorney

_____  _____
DOROTHY L. McMURTRY, #37727MO
Assistant United States Attorney